UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ELAINE PINKERT,

        Plaintiff,

v.                                                Case No. 11-C-392

JOURNAL SENTINEL, INC.,

        Defendant.

---

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

In April 2011, Plaintiff Elaine Pinkert filed this action against Defendant Journal Sentinel, Inc. (the Journal) alleging unlawful age discrimination under the Age Discrimination in Employment Act (the ADEA), 29 U.S.C. § 621 *et. seq*. The Journal filed a motion for summary judgment on May 14, 2012 (ECF No. 17) contending Plaintiff was terminated for legitimate job performance reasons unrelated to her age as part of a reduction in force and that Plaintiff cannot establish the Journal's reasons for terminating her employment were pretextual. For the reasons discussed herein, Defendant's motion will be granted.

**BACKGROUND**

The Journal publishes and distributes the major daily newspaper in Milwaukee, Wisconsin and the surrounding metropolitan area. (Def. St. of Prop. Facts, "SOPF," ECF No. 19 ¶ 4.) Plaintiff was born on September 16, 1952. (Pl. St. of Add. Facts, "SOAF," ECF No. 25 ¶ 1.) She began working for the Journal in May or June of 1979. (SOAF ¶ 2.) She worked part-time until August

1979, when she began working full time as an Advertising Sales Representative. (*Id.*) Plaintiff worked in the Automotive Sales Department for approximately a total of 20 years. (*Id.* ¶ 3.) For her first six years she was an Automotive Account Executive. (*Id.*) The last 13 years she worked as an Automotive Major Account Executive selling automotive advertising to automobile manufacturers, automobile dealer associations and local automobile dealers. (E. Pinkert Aff., ECF No. 28 ¶ 3.)

As of early 2009, the Journal employed eight Automotive Account Executives. (SOPF ¶ 13.) Three of these Automotive Account Executives exclusively sold online advertising. (*Id.*) The remaining five (Plaintiff, Aly Pankowski, Erin Foster, Brian Wirkus, and Nancy Myers) sold both print and online automotive advertising. (*Id.*) Plaintiff principally sold advertising to national accounts such as the automobile manufacturers or dealer associations. (*Id.* ¶ 12.) While the other representatives sold print/online advertising to 20 or 30 local automotive dealers each, Plaintiff sold to only four local dealers. (*Id.* ¶ 14.)

In late 2008, the Journal implemented a series of reductions in forces (RIFs) which continued throughout 2009. (*Id.* ¶ 18.) In all, approximately 200 employees lost their employment in 2009 and 150 employees lost their jobs in 2008 as a result of the Journal's RIFs. (*Id.* ¶ 19.) In particular, the Journal's management concluded the Automotive Sales Department could no longer support the five print/online automotive advertising sales representatives and decided to eliminate one automotive print/online sales position as part of an April 2009 RIF.

Plaintiff was 56 years old when she was terminated from the Journal on April 5, 2009. (SOAF ¶ 20.) In all, approximately 40 employees, including Plaintiff, were terminated as part of the April 2009 RIF and approximately 160 employees were later terminated in 2009. (SOPF ¶ 20.)

2

On or about the date Plaintiff was terminated, she was offered a separation agreement. (SOAF ¶ 22.) The Journal included the required notice under the Older Workers Benefit Protection Act (OWBPA). (*Id.*) The notice included a list of Journal employees who were selected for termination as well as a list of Journal employees who were not selected for termination. (*Id.*) But the notice failed to include the job titles and ages of the employees in the Automotive Sales Department who were not selected for termination. (*Id.* ¶ 23.) Therefore, the Journal submitted a revised notice under the OWBPA to correct its failure to include the job titles and ages of the employees in the Automotive Sales Department who were not selected for termination in the original notice. (*Id.* ¶24.) The revised notice reveals that all of the employees in the Automotive Sales Department who were not selected for termination were younger than Plaintiff. (*Id.* ¶ 24.) After Plaintiff was terminated, her accounts were reassigned to Pankowski, who was an Automotive Account Executive in the Automotive Sales Department. (*Id.* ¶ 28.) Pankowski was 34 years old at the time.

**LEGAL STANDARDS**

Under Rule 56(c), "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Id.* Once the moving party has demonstrated the absence of a genuine issue of

3

material fact, the burden shifts to the non-moving party to show that there is a genuine dispute as to the material facts of the case. *Id.* at 323–24. The responding party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

The ADEA prohibits an employer from "discharg[ing] any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1) (2003). To establish a claim under the ADEA, a plaintiff-employee must show that "the protected trait (under the ADEA, age) actually motivated the employer's decision"— that is, the employee's protected trait must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). Such a claim may be proven through direct evidence of the employer's discriminatory motive, or through the indirect, burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Plaintiff's claim here arises under the indirect method. (Br. in Opp. at 6.) To prove a claim under the indirect method, a plaintiff must demonstrate that she (1) was over 40 years old; (2) was meeting her legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than younger, similarly situated employees. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). In a "mini-RIF" case like this one where an employee is terminated and remaining employees absorb her job duties, Plaintiff need not prove the fourth prong of the traditional prima facie case. Instead, she must show her duties were absorbed by employees outside

4

the protected class. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002); *see also Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 (7th Cir. 2006).

If the plaintiff succeeds in establishing a prima facie case, this creates a rebuttable presumption of discrimination and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. *Little v. Ill. Dep't of Rev.*, 369 F.3d 1007, 1011 (7th Cir. 2004). Once an employer articulates a legitimate, nondiscriminatory rationale for termination, the burden shifts back to the plaintiff to demonstrate the proffered reason is merely pretextual. *Id.* It is not enough for a plaintiff to focus on just one of these elements; at a minimum he must demonstrate a triable issue as to each element in order to survive summary judgment. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1003 (7th Cir. 2002). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

**ANALYSIS**

The Journal contends it is entitled to summary judgment on two grounds. First, the Journal contends Plaintiff cannot show she was meeting the Journal's legitimate performance expectations at the time she was terminated and she is therefore unable to establish a prima facie case. Alternatively, the Journal contends, even if Plaintiff could establish a prima facie case, the Journal says it had several nondiscriminatory reasons for terminating Plaintiff as part of its April 2009 RIF. These arguments will be addressed in greater detail below.

5

**1. Legitimate Performance Expectations**

As noted above, to establish a prima facie case of age discrimination under the indirect method, a plaintiff must demonstrate she was meeting her legitimate performance expectations. The Journal posits it made its termination decisions based on job performance in the following manner. In assessing which of the five print/online automotive sales representatives would be included in the April 2009 RIF, Senior Vice President of Interactive Sharon Prill, Vice President of Classified and Online Sales Daryl Hively, and Director of Online Sales Jandell Herum state that they focused on the relative sales performance of the five representatives as well as their abilities to grow revenues going forward. (SOPF ¶ 25.) Prill, Hively, and Herum said they considered the Journal's ability to sell digital media as critical to its future success. (*Id.* ¶ 25.) Herum looked at both print and online revenues for 2008 when making her selection decision. (*Id.* ¶ 26.) In addition, because of a belief that the Journal was able to impact sales to local dealers more than it could sales to national automotive accounts, Herum also considered the sales representatives' relationships with local automotive dealers. (*Id.* ¶ 26.)

With the above factors in mind, Herum ultimately selected Plaintiff for inclusion in the April 2009 RIF. Herum says she based this decision on the fact that Plaintiff had the greatest decline in the ratio of her sales revenue to goal during 2008 (including her significantly lower online sales revenue to goal), on Plaintiff's overall decline in revenue, and on Plaintiff's lack of relationships with local automotive dealers as compared to the other print automotive sales representatives. (*Id.* ¶¶ 27–28.) In particular, during 2008, Plaintiff achieved only 67% of her online sales goal while her peers achieved 89%, 85%, 95%, and 91% of their respective online sales goals. (*Id.* ¶ 29–33.) Additionally, Plaintiff lost over $1.4 million in revenue in 2008 and thus only reached 67.08% of

the prior year's revenue for her account panel. In contrast, her peers were able to reach 86.79%, 99.29%, 102.36%, and 97.77% of the prior year revenues for their respective account panels. (*Id.* ¶ 34–38.) Finally, in Herum's and Hively's views, the others had all developed strong relationships with local dealers and had many more local dealer accounts than Plaintiff. (*Id.* ¶ 40.) Plaintiff's accounts were primarily national for which the Journal mostly received and processed orders for advertisements, as opposed to making direct sales. (*Id.*¶ 41.) The management thus believed Plaintiff's national accounts could easily be transferred to and absorbed by other automotive sales representatives, whereas it was much more disruptive to transfer local dealer accounts from one sales representative to another due to the account-specific relationship between the dealer and the sales representative. (*Id.* ¶ 42.) For these reasons, the Journal contends, Plaintiff was terminated. (*Id.* ¶ 20.)

Plaintiff attempts to counter these performance-related termination explanations in several ways. Plaintiff, who was hired in 1979, first appears to argue that she had a long tenure with the Journal and that her length of service should count for something. (*Id.* ¶¶ 50, 54, 58.) But her performance during any period other than 2008 is irrelevant. As the Journal notes, and as any media consumer knows, the newspaper advertising environment has changed radically in recent years due both to the dominance of internet advertising and the general economic decline since 2008. (*Id.* ¶ 15.) Further, the Seventh Circuit has repeatedly held that an employee must be meeting her employer's expectations at the time of the decision at issue. *See, e.g.*, *Spector v. U.S. Bank Nat'l Ass'n*, 286 Fed. Appx. 333, 335 (7th Cir. 2008); *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946

7

(7th Cir. 2006). Plaintiff must therefore show that she was meeting the Journal's employment expectations during the period under consideration, which was 2008.[1]

Plaintiff cannot make this showing. As described in detail above, the record indicates Plaintiff was not meeting certain aspects of the Journal's expectations as of the end of 2008, as she had only achieved 67% of both her previous year overall revenue and online revenue goals. (SOPF ¶¶ 29, 34.) It is true, as Plaintiff notes, her 2008 revenues were still second among all of the Automotive Account Executives. (Pinkert's Resp. to Def. St. of Prop. Facts, "Pinkert's RSOPF," ECF No. 24 ¶ 34.) It is also true, as Plaintiff notes, that her goal was substantially higher in 2008 than the other Automotive Account Executives because of her high revenue achievement in 2007. (SOAF ¶ 17.) But the Journal reasonably maintains it was more concerned with its automotive sales representatives' 2008 sales revenue to goal percentages because these percentages were "more indicative of an ability to increase" the Journal's revenues "year over year." (Br. in Reply, ECF No. 36 at 7; Journal Sentinel Inc.'s Resp. to Pl. St. of Facts, "JSI Reply DPFOF," ECF No. 37 ¶¶ 35–38.)[2] Further, the ultimate goal for each account representative — including Plaintiff — was

---

[1] The Journal's managers testified that they only considered 2008 revenues and the representative's relationships with local dealers in making the selection decision. (SOPF ¶ 43.) Plaintiff's managers said they did not consider performance during the first quarter of 2009 because initial recommendations for inclusion in the RIF were made in about January 2009, well before the quarterly sales numbers were available. (*Id.* ¶ 44.) For this reason, Plaintiff's claim that she was meeting the Journal's performance expectations because she had the highest online sales in the Automotive Sales department during the first quarter of 2009 (Br. in Opp. at 8–9) is not relevant.

[2] The Journal also says Plaintiff's argument ignores the fact that the revenue goals for each print/online automotive sales representative's panel were established according to the composition of the account panel and the amount of revenue each account was likely to generate during the year. (JSI Reply DPFOF ¶¶ 35–38.) Therefore, in any year, the revenue goal for Plaintiff's account panel was typically higher because Plaintiff's account panel was primarily made up of large national dealers and dealer association accounts, which were expected to provide substantially more revenue than the exclusively local dealer account panels managed by other print/online automotive sales representatives. (*Id.*)

to increase the revenue generated by their particular panel on a year-over-year basis. (2nd Couden Supp. Aff., Ex. C, Hively Dep., ECF No. 35-3 at 56, 59.) Plaintiff cannot and has not disputed that the revenue for her account panel decreased by over $1.4 million (a 33% loss) from 2007 to 2008. Her argument that her goal was higher than the goals of the other print/online sales representatives ignores the fact that the composition of the different account panels was taken into consideration in setting the goals for each of the representatives. Plaintiff's account panel consisted of primarily large national dealers and dealer association accounts, which were expected to provide substantially more revenue than the exclusively local dealer account panels managed by the other print/online automotive representatives. The Journal's expectation was that the representatives would increase the revenue from their accounts every year. Plaintiff's argument that her goal was somehow unfair thus does not change the fact that her performance was less than satisfactory at the time of her termination. In contrast, the Journal's rationales for her termination are reasonably performance-related, and the Journal is accordingly entitled to summary judgment on this ground.

Finally, Plaintiff alleges, without citing the testimony of any Journal management employees, that (1) print sales are the lifeblood of the Journal's automotive sales and revenue from print sales was three times higher than revenue from online sales; (2) another Journal Sentinel employee, Andy Kirchen, was terminated in an earlier RIF because his print sales were allegedly the lowest in the department;[3] and (3) it is "simply ridiculous" to suggest the Journal would terminate Plaintiff after 20 years of service because of her low percentage of performance to goal

---

[3] Plaintiff suggests Kirchen's termination is noteworthy because he had achieved about 92.58% of his performance to goal for online sales through the first 11 out of 12 periods of 2008. (SOPF and Pinkert's RSOPF ¶ 26.) Plaintiff suggested that this evidence demonstrates somehow that online sales were less important than print sales and that the Journal is only now, disingenuously, asserting that online sales are critical.

9

in 2008. (Br. in Opp. at 8–9.) But some of these facts are not even within Plaintiff's personal knowledge (i.e., the reasons for Kirchen's termination) and Plaintiff's own allegations and testimony regarding her performance are unavailing. It is the "perception of the decisionmaker, not the employee, that is relevant." *Adreani v. First Colonial Bank-shares, Corp.*, 154 F.3d 389, 398 (7th Cir. 1999); *see also Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) (requiring the court to look through the eyes of the plaintiff's supervisor at the time of the termination decision). Plaintiff's suggestions, therefore, do not create a genuine issue of material fact regarding whether her performance was satisfactory at the time the decision was made to terminate her employment.

**2. Nondiscriminatory Reasons for Termination**

Even assuming, *arguendo*, Plaintiff could establish a prima facie case of discrimination, the Journal has articulated legitimate nondiscriminatory reasons for Plaintiff's termination. As stated above, if a plaintiff succeeds in establishing a prima facie case, this creates a rebuttable presumption of discrimination and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. *Ill. Dep't of Rev.*, 369 F.3d at 1011. Once an employer articulates a legitimate, nondiscriminatory rationale for termination, the burden shifts back to the plaintiff to demonstrate the proffered reason is merely pretextual. *Id.*

To "show pretext" a plaintiff must "squarely rebut" each specific reason articulated by the defendant. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997). In assessing whether the employer's stated reasons for an employment action are pretextual, the inquiry should focus on whether the decisionmaker honestly believed that terminating the plaintiff was the appropriate decision at the time the decision was made. *Merillat*, 470 F.3d at 693; *see also Little*

10

*v. Mitsubishi Motor Mfg. of Am., Inc.*, No. 04-1034, 2007 WL 418897 (C.D. Ill. Feb. 2, 2007) ("When addressing whether a proffered reason is pretext, the court's only task is to determine whether the defendant 'honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or baseless.'") (citing *Jackson v. E.J. Branch Corp.*, 176 F.3d 971, 984 (7th Cir. 1999)). The employer's justification need not be a 'good reason' but merely an age-neutral one. *Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008) (citations omitted). An employer's mistake is not enough to state a claim when the employer in good faith relied on legitimate non-discriminatory reason; in fact, the Seventh Circuit has held that even if a plaintiff's performance was satisfactory it does not mean her termination as part of a RIF was discriminatory. *Balderston v. Fairbanks Morse Engine Div. Of Coltec Indus.*, 328 F.3d 309, 323 (7th Cir. 2003) (stating plaintiff did not demonstrate pretext when there was no evidence to show that the employer did not honestly believe it was dismissing a poorer performing, less suitable employee in a RIF).

In light of the legitimate, non-discriminatory reasons articulated by the Journal for Plaintiff's inclusion in the April 2009 RIF as discussed above, Plaintiff was required to present evidence sufficient to call the truthfulness of the Journal's stated reasons into question and to show Herum did not honestly believe these reasons and rely on them in including Plaintiff on the list for termination. In the age discrimination context, it is not even enough for Plaintiff to demonstrate her age was a motivating factor in the decision; she must show that "but for" her age, the Journal would not have terminated her employment as a part of the April 2009 RIF. *Martino v. MCI*, 574 F.3d 447, 455 (7th Cir. 2009); *see also Gross v. FBL Financial Servs.*, 557 U.S. 167, 177–78 (2009) (noting that a plaintiff "must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision."). Plaintiff fails to create any dispute that Herum truthfully

11

and honestly believed Plaintiff should be included in the RIF based on the factors Herum says she relied upon: Plaintiff's lower online sales to goal percentage in 2008, her $1.4 million decline in revenue from 2007 to 2008, and the fact that Plaintiff had fewer local dealer accounts than the other print/online automotive sales representatives.

Instead, in support of her pretext argument, Plaintiff identifies a number of factors *she* claims support her conclusion that she was more successful and more qualified than the younger employees who were retained by the Journal. (Br. in Opp. at 12.) Specifically, Plaintiff believes the Journal should not have terminated her employment because (1) she was 56 years old; (2) she had been in the Automotive Sales Department for approximately 20 years; (3) she generated $2,667,744 in print sales revenue in 2008; and (4) her online sales during the first quarter of 2009 topped the Automotive Sales Department. (*Id.*)[4] However, these facts do not in any way indicate Herum did not honestly believe Plaintiff should be included in the April 2009 RIF based on her lower online sales to goal percentages in 2008, her $1.4 million decline in revenue, and her lower number of local dealer accounts. The "subjective beliefs" of a plaintiff are "insufficient to create a genuine issue of material fact." *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 574 (7th Cir. 1998). *See also*

---

[4] Plaintiff also tries to argue the Journal Sentinel previously allowed Myers to transfer from Recruitment Sales to the Automotive Sales Department in December 2008 after her position was eliminated (Br. in Opp. at 12), but this in no way rebuts the Journal's articulated reasons for Plaintiff's termination in April 2009. Indeed, as of January 2009, when Herum made (and Hively approved) the decision to include Plaintiff in the April 2009 RIF, Myers had achieved both a higher online sales revenue to goal percentage and had experienced only a small decline in revenue during the month(s) that she was a print/online Automotive Account Executive in 2008. (SOAF and Pinkert's RSOPF ¶¶ 33, 38.) Myers also had prior automotive sales experience, an account panel made up entirely of local dealer accounts, and was responsible for more local dealer accounts than Plaintiff. (JSI Reply DPFOF ¶¶ 39, 42.) Thus, the fact that Myers was transferred in December 2008 — prior to the time the Journal decided to conduct additional job limitations — does nothing to establish that the Journal's articulated reasons for Plaintiff's April 2009 termination were somehow pretextual.

12

*Johal*, 434 F.3d at 946–47 ("It is not our role to question the wisdom of a company's decision on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination."); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 n. 8 (7th Cir. 2006) (noting plaintiff fails to raise a genuine issue of fact merely by challenging the judgment of supervisors); *Holmes v. Potter*, 384 F.3d 356, 361–62 (7th Cir. 2004) ("[W]e do not sit around as a super-personnel department that reexamines an entity's business decisions and reviews the propriety of that decision."); *Ost. v. W. Suburban Travelers Limousine Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("[A] plaintiff's own opinions about her own work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions."). In other words, here, Plaintiff has not offered any evidence to rebut what the Journal has held out as its legitimate business judgments. Plaintiff therefore has not established that a genuine issue of material fact exists regarding pretext.

Finally, Plaintiff suggests the Journal's statement that her termination was based on the RIF is "either factually baseless or was not the actual motivating reason for [] discharge." (Br. in Opp. at 12.) She emphasizes in particular that she was told her termination was economic and not performance-based. But in a RIF this does not bar the Journal from relying on what it views as shortcomings in Plaintiff's job performance. The Journal has offered a substantial amount of evidence demonstrating its revenues declined dramatically in late 2008 and early 2009, as well as evidence indicating that over 350 employees were terminated in 2008 and 2009.[5] (SOPF ¶¶ 15–20.) "[In] a reduction in force, someone has to go." *Fairchild*, 147 F.3d at 573. As a result, in a RIF,

---

[5] For example, in late 2008, the Journal's principal online automotive sales partner, Cars.com, terminated its advertising contract, which resulted in lost automotive advertising revenues of over $600,000 in the first quarter of 2009 alone. (SOPF ¶ 16.)

13

an individual whose performance "could also be characterized as satisfactory or adequate" may lawfully be terminated. *Merillat*, 470 F.3d at 694. Plaintiff's attempts in this regard are accordingly unavailing.

## CONCLUSION

Plaintiff has not created a genuine issue of material fact regarding her performance. More significantly, though, perhaps, she has pointed to no evidence suggesting the Journal's reasons for terminating her were in any way pretextual. The newspaper industry is struggling, especially in tough economic times, and Plaintiff has pointed to nothing to cast doubt on the Journal's explanation that it made a legitimate decision to terminate her as part of a RIF due to her failure to meet her overall revenue and online revenue goals. Accordingly, Defendant's Motion for Summary Judgment (ECF No. 17) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant dismissing the action with prejudice.

**SO ORDERED** this   31st   day of July, 2012.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge